**Vernon BROWN, Plaintiff,**

v.

**The UNITED STATES of America, acting By and Through the FARMERS HOME ADMINISTRATION OF the DEPARTMENT OF AGRICULTURE, Defendant.**

**Civ. No. 84–1036.**

United States District Court,
D. South Dakota, N.D.

Dec. 5, 1985.

William J. Pfeiffer, Forrest C. Allred, Aberdeen, S.D., for plaintiff.

Ray P. Murley, Asst. U.S. Atty., Sioux Falls, S.D., for defendant.

**MEMORANDUM OPINION**

DONALD J. PORTER, Chief Judge.

**FACTUAL BACKGROUND**

In connection with loans Donald M. Markuson (hereinafter Markuson) received from the Farmers Home Administration (FmHA) in the late 1970's and early 1980's, Markuson executed a series of security agreements with the FmHA. Each of these agreements, which were dated April 24, 1978; May 27, 1980; November 13,

1980; and May 21, 1981, granted FmHA, in identical language, a security interest in "All livestock ... now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto, including but not limited to the following." The April 24, 1978 agreement specifically listed a one-half interest in 25 cows and the calves of those cows, four yearlings, one Holstein cow, and one Holstein bull. The May 27, 1980 agreement specifically listed 96 "mixed" cows, two Hereford bulls, and one Angus bull. The November 13, 1980 agreement specifically listed 94 mixed beef cows, 88 mixed calves, and two Hereford bulls. The May 21, 1981 agreement specifically listed 127 mixed cows and eight Limousin bulls.

In December, 1981, Markuson proposed to plaintiff that Markuson knew of fifty "Black Baldy" cattle that Markuson would buy with plaintiff's money, then re-sell at a higher price. Plaintiff would then recover the purchase price, and plaintiff and Markuson would split the profit. On or about December 24, 1981, plaintiff mailed a check for $20,000 to Markuson. Markuson put the check in his account, and bought the fifty cattle, none of which ever carried a brand. Plaintiff never filed a financing statement on the cattle or made any attempt to put notice of this transaction in the public records.

In January, 1982, plaintiff went to Markuson's ranch, near Ipswich, South Dakota, and viewed the cattle which were in a lot separate from other cattle in Markuson's possession. Plaintiff then went on a trip to California, and apparently had nothing more to do with the cattle. Markuson testified that shortly after plaintiff's visit, the occurrence of a blizzard required that he put the fifty cattle in a field with his other cattle. Although Markuson's recollection at trial was hazy at best, it appears that some of plaintiff's cows were then given to a third party in Mobridge, South Dakota, who had also been keeping cattle on Markuson's ranch. The rest of the cattle on Markuson's property, including all of plaintiff's cows, were sold in February, 1982, apparently at the urging of an FmHA official who, after a visit to Markuson's ranch on February 17, 1982, sought to liquidate Markuson's cattle operation. Markuson never told FmHA of the arrangement with plaintiff, and gave FmHA the checks from the sale of the cattle, totalling $34,298.54.

When plaintiff returned to South Dakota in March, 1982, he discovered the sale of the fifty cattle, and eventually contacted FmHA, seeking a return of the $20,000. FmHA refused, and plaintiff thereafter commenced this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), alleging conversion.

Initially, this court entered judgment for the defendant but vacated its order in consideration of the Eighth Circuit's decision in *Rohweder v. Aberdeen Production Credit Ass'n.*, 765 F.2d 109 (8th Cir.1985). Having considered the significance of *Rohweder* in relation to the facts of this case, this Court reaffirms its judgment for the defendant.

## DISCUSSION

### I.

The issue is whether the fifty cattle became subject to the FmHA security agreements by operation of SDCL 57A–9–203(1) (1984 Supp.). This statute provides that a security agreement attaches when (1) there is an agreement that it attach; (2) value is given by the secured party; and (3) the debtor has rights in the collateral. Here there were agreements between FmHA and Markuson providing for the attachment of the security interest to after-acquired livestock, and value has been given by FmHA, the secured party. The question before this court is whether Markuson had adequate rights in the fifty cattle for the security interest to attach.

In *Rohweder,* the court held that a debtor would not have sufficient rights in the collateral for attachment of a security interest "if the parties intended to create a bailment, with [the bailor] retaining complete ownership of the [property] and relinquishing only possession." 765 F.2d at

113.[1]  Plaintiff alleges that the oral agreement between himself and Markuson constituted a bailment and therefore Markuson had no rights in the collateral for FmHA's security interest to attach.  Under South Dakota law, a bailment constitutes the delivery of personal property to another in trust for a specific purpose with an express or implied contract that the trust be faithfully executed and the property returned or accounted for when that purpose is accomplished or kept until reclaimed by the bailor.  *Johnson v. Hanna,* 78 S.D. 324, 101 N.W.2d 830, 835 (1960).

Due to the lack of evidence of delivery of the cattle to Markuson, this court concludes there was no bailment as to preclude attachment of the security interest.  Delivery necessary to establish the existence of bailment turns on whether possession and control is retained by the owner or delivered to the bailee.  *Nelson v. Schroeder Aerosports, Inc.,* 280 N.W.2d 107, 109 (S.D. 1979).  Unlike in *Rohweder,* no evidence was offered in this case of any actual delivery of the cattle to the bailee, Markuson, for the purpose of a sale.  Moreover, no constructive delivery can be established since the $20,000 check received by Markuson was placed in his own account.  (T.32).  Since Brown's check was commingled with Markuson's funds and was in no way traceable to the cattle purchased by Markuson, Brown retained no ownership interest in the cattle sufficient to establish a bailment.

The plaintiff offered testimony by both plaintiff and Markuson that plaintiff was to "own the cattle."  Such testimony is nevertheless outweighed by evidence of almost unbridled discretion allowed and exercised by Markuson in the purchase and sale of the cattle.  In *Rohweder,* 765 F.2d at 113, the court suggested that "factors of control over the cattle ... are relevant evidence for the jury in determining the parties' intent to transfer an ownership interest to [the bailee]."  Here the plaintiff never saw the cattle before purchase.  Markuson was given total discretion on the sale.  While for a time the cattle were kept separate on Markuson's land, testimony suggested that the separation was left to Markuson's judgment and was based upon opinion that to do so would facilitate the sale of the cattle (T.43).  No attempt was made on the part of either party prior to sale to inform outsiders of the alleged ownership interests of the plaintiff.  This court concludes that the evidence has failed to establish the retention of an ownership interest in the plaintiff or any relinquishment of possession necessary to establish a bailment.

## II.

■  Even if the plaintiff had established ownership of the cattle, the court is unconvinced that a third party's ownership interest in collateral bears any substantial weight in determining a debtor's "rights in collateral" for purposes of attachment of a security interest.  The official comment to § 9–202 states unequivocally that "[t]he rights and duties of parties to a security transaction and of third parties are stated

---

**1.**  The court cited *In re Sitkin Smelting & Refining, Inc.,* 639 F.2d 1213, 1216 (5th Cir.1981) for the proposition that "the security interest of a bailee's creditor does not attach to goods which are the subject of a bailment."  765 F.2d at 112.  In *Sitkin,* Kodak had entrusted the goods in question to the debtor, Sitkin Smelting & Refining, Inc.  Equating the concepts of entrustment and bailment, the court applied the Code's entrustment provision, U.C.C. § 2–403(2), to defeat the interest of the debtor's secured creditor.  That section provides that one who turns over possession of goods to a merchant who deals in goods of that kind is deemed to empower the entrustee to sell the goods to a buyer in the ordinary course of business.  Since the debtor's creditor as a holder of a security interest did not constitute a "buyer in the ordinary course of business", the interests of the entruster prevailed.  639 F.2d at 1215–16.  In the present case, however, there was no entrustment since there was no transfer of the cattle from plaintiff to Markuson.  See *infra.*  Therefore, U.C.C. § 2–403(2) would not operate in this instance to protect the interests of plaintiff over the security interest of FmHA.  Although the lack of transfer of collateral makes it unnecessary in this case to consider the status of Markuson as a merchant, the absence of a finding that entrustee is a merchant would also preclude applicability of the entrustment provision.  See *Toyomenka, Inc. v. Mount Hope Finishing Co.,* 432 F.2d 722, 727–28 (4th Cir.1970).

in this Article without reference to the location of 'title' to the collateral." Even if a party retains ownership interest in a piece of collateral, a debtor who retains that collateral is still able to mislead potential creditors by exercising his "rights" of possession and control over the collateral. It is the outward appearance of a *debtor's* rights of ownership and control in the collateral that determines whether attachment of a security interest is effective and not the right of a party who may have title to the collateral.

It is the task of this court, therefore, to determine whether Markuson had sufficient "rights" in the cattle for FmHA's security interest to attach under the after-acquired property clause. While the UCC provides no definition of "rights in the collateral" under § 9–203, the "mere possession of collateral or an unexercised option to purchase does not give the debtor sufficient rights for a security interest to attach." *Rohweder v. Aberdeen Production Credit Ass'n.*, 765 F.2d 109, 112 (8th Cir. 1985) (citing *Pontchartrain State Bank v. Poulson*, 684 F.2d 704, 707 (10th Cir.1982)). Similarly, a possessory interest for a limited purpose such as repair of property does not constitute "rights in the collateral." *Matter of Chicago, Madison & Northwestern Ry. Co.*, 36 B.R. 292, 298 (Bankr.D. Wis.1984); *Chrysler Corp. v. Adamatic, Inc.*, 59 Wis.2d 219, 235, 208 N.W.2d 97 (1973).

The debtor must have some ownership interest in the collateral before a security interest arises. *Northwestern Bank v. First Virginia Bank of Damascus*, 585 F.Supp. 425, 429 (W.D.Va.1984). In *Kinetics Technology Corp. v. Fourth National Bank of Tulsa*, 705 F.2d 396, 398 (10th Cir.1983), the Tenth Circuit noted, however, that a debtor need not have full ownership rights for attachment to occur. Addressing the question of the sufficiency of rights that need be demonstrated, the court wrote as follows:

> Thus, it is clear that for a security interest to attach, a debtor must have some degree of control or authority over collat-

eral placed in the debtor's possession. The Oklahoma Supreme Court, in a case factually similar to the case before us, has said that the requisite authority exists "where a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession." *Morton Booth Co. v. Tiara Furniture, Inc.*, 564 P.2d 210, 214 (Okl.1977).

705 F.2d at 399. In *Kenetics*, Oklahoma Heat Transfer (OHT) manufactured heat exchangers to specifications supplied by customers. The Bank had a perfected security interest in OHT's inventory, including after-acquired inventory. Kenetics designed and supplied process furnaces for the petrochemical industry. OHT contracted with Kenetics to build certain furnaces, using OHT inventory and specially designed parts furnished by Kenetics and to deliver the completed products to Kenetics for the agreed sum. The issue was whether the parts owned by Kenetics and delivered to OHT were covered by the Bank's security agreement with debtor OHT. Kenetics contended it was a bailor and OHT a bailee as to the parts delivered to OHT. The Bank contended that the parts in OHT's possession were inventory covered by its security interest. The court rejected OHT's bailment argument and held that the security interest attached since the debtor's rights exceeded the "naked possession" standard.

In the present case, the evidence is clear that Markuson's interests and authority over the fifty cattle significantly exceed the "naked possession" standard as stated in *Kenetics*. Plaintiff and Markuson entered into an oral agreement whereby plaintiff was to advance the price of the cattle and Markuson was to select, purchase, feed, shelter and sell the cattle at a profit, at which time the purchase price and one-half the profit was to be returned to plaintiff. Although apparently approval was needed on the purchase, plaintiff never saw the cattle before they were purchased. Evidence also indicates that Markuson was given complete discretion on the sale of the cattle, as plaintiff was out of state at the

 

time. Plaintiff testified that the re-sale of the fifty cattle was intended to have been within a few days of the original purchase of the cattle, with the apparently preferred place of sale to be at Mobridge, South Dakota. Yet, in response to the question of whether plaintiff had to approve the sale, plaintiff testified, "No. I just turned them over to [Markuson]. He told me what he was doing with his cattle and I said all right and it was left up to him." (T.129). Plaintiff further testified that there was no limitation on the place of sale. Markuson could have sold them anywhere "if he could have found a place. That was the object to sell the cattle and sell them where the best money was." (T.130).

The cattle in controversy were kept on Markuson's ranch. Although they were initially kept separate from Markuson's herd, there was no agreement that the cattle not be commingled. (T.44). Markuson testified that the purpose of the separation was to facilitate the sale of the cattle. (T.43). At no time did plaintiff call attention to any objection, or assert his interest in the cattle to any third party. (T.19). The first time FmHA had knowledge of plaintiff's interest was after the sale. Since the cattle acquired by Markuson fit the description of the cattle under the security agreements, FmHA had no reason to know of any outside interest in the collateral.

This court has no difficulty in finding that, under the prevailing case law, Markuson had sufficient rights in the cattle to allow attachment of FmHA's security interests. The discretion given Markuson by the plaintiff allowed Markuson to treat the cattle as if they belonged to him. It is significant that while the cattle were in his possession, Markuson allowed some of them to be used to satisfy a personal debt to a third party. Such authority clearly goes beyond a "naked possession" of the cattle. FmHA was therefore well within its rights to appropriate the proceeds from the sale of the cattle and plaintiff has no claim against defendant.

While such a result may appear harsh, the reason for the rule is clear. As explained by the court in *Kenetics:*

if a debtor received collateral from a third party under an agreement giving the debtor authority to exercise any outward indicia or manifestations of ownership or control, a would-be creditor could easily be misled into making a loan under an ineffective security agreement.... [A] buyer-lender could easily protect itself from after-acquired property creditors ... by filing an Article Nine purchase money security interest in the goods.... Requiring buyers ... to take this additional step—done easily and at minimal cost—thoroughly advances the Code policy of providing notice and certainly to inventory lenders.

705 F.2d at 399–400.

Accordingly, judgment is rendered for the defendant.

This opinion constitutes the findings of fact and conclusions of law of this Court.